*Craig T. Conley,* for appellant.

STEVENS, APPELLANT, *v.* ACKMAN ET AL.; CITY OF MIDDLETOWN, APPELLEE.

[Cite as *Stevens v. Ackman* (2001), 91 Ohio St.3d 182.]

(Nos. 00–225 and 00–513—Submitted November 29, 2000—Decided March 28, 2001.)

ALICE ROBIE RESNICK, J.

I

Facts and Procedural History

On December 16, 1994, seventeen-year-old Corey C. Banks died in an automobile accident on Roosevelt Avenue (also called Roosevelt Road) in Middletown, Ohio. Banks was a passenger in an automobile operated by Emily J. Duff, now known as Emily J. Ackman, a classmate of his at Middletown High School. Duff's vehicle went left of center in a heavy rain and collided with an oncoming vehicle. When police arrived at the scene, Banks was dead.

On December 13, 1996, plaintiff-appellant Shira Sue Stevens (the mother of Banks and the administrator of his estate) filed a complaint against Ackman and appellee, the city of Middletown, in the Butler County Court of Common Pleas, alleging that they were responsible for the wrongful death of Banks. Stevens asserted that Middletown was liable for Banks's death for its failure to properly maintain Roosevelt Road, including allowing an unsafe pavement edge drop to exist on the side of the road, which caused Ackman to lose control of her vehicle when she attempted to return it to the roadway after it had dropped off the pavement edge. Stevens alleged that Middletown breached its duty to maintain Roosevelt Road open, in repair, and free from nuisance, and that the roadway was unsafe.

Middletown moved for summary judgment pursuant to R.C. Chapter 2744, the Political Subdivision Tort Liability Act, claiming that it was entitled to statutory immunity and that Stevens was unable to prevail against it as a matter of law. Middletown argued that the exception to political subdivision immunity found in R.C. 2744.02(B)(3) ("political subdivisions are liable for injury, death, or loss to persons or property caused by their failure to keep public roads * * * open, in repair, and free from nuisance") was not applicable in the circumstances of this case to defeat its immunity.

The trial court denied the motion for summary judgment, relying on this court's decisions in *Dickerhoof v. Canton* (1983), 6 Ohio St.3d 128, 6 OBR 186, 451 N.E.2d 1193; *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 322, 587 N.E.2d 819, 823; and *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 632 N.E.2d 502, to conclude that the alleged failure of the city to eliminate the edge drop on Roosevelt Road was potentially a failure to keep the roadway free from nuisance pursuant to the exception to immunity under R.C. 2744.02(B)(3). The trial court specifically rejected Middletown's argument that the city could be liable only for the failure to maintain the actual roadway itself, so that there could be no liability because the shoulder or berm of Roosevelt Road was not the roadway.

The trial court also found that there were issues of fact as to whether Middletown had notice of the condition, and further that there was no merit to Middletown's contention that the defense for discretionary decisions contained in R.C. 2744.03(A)(5) was applicable. The trial court determined that the city had failed to meet its burden in support of the motion and that genuine issues of material fact remained to be determined.

Middletown appealed the denial of its summary judgment motion to the Court of Appeals for Butler County, initially relying on R.C. 2744.02(C): "An order that denies a political subdivision or an employee of a political subdivision the benefit

of an alleged immunity from liability as provided in Chapter 2744. or any other provision of the law is a final order."

After the parties had briefed the appeal on the merits, Stevens filed a motion to dismiss the appeal on August 10, 1999, primarily arguing that R.C. 2744.02(C) was not retroactive to apply to a case arising from a death that occurred in 1994. Stevens also argued that the order appealed from was not a final order because it was taken from a trial court ruling on issues of fact, not of law, and further argued that the failure of the trial court to determine in its order that there was "no just reason for delay" deprived the court of appeals of jurisdiction. See Civ.R. 54(B).

Before the court of appeals ruled on that motion to dismiss, this court, on August 16, 1999, announced the decision in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062. On August 25, 1999, Stevens filed a second motion in the court of appeals to dismiss the appeal, again urging that the court of appeals was without jurisdiction to entertain Middletown's appeal. Stevens argued that because R.C. 2744.02(C) was enacted in Am.Sub.H.B. No. 350 ("H.B. 350"), and because this court's opinion in *Sheward*, at paragraph three of the syllabus, had declared H.B. 350 to be "unconstitutional in toto," there was no basis for the court of appeals to maintain jurisdiction over the appeal.

Middletown responded to Stevens's second motion to dismiss by arguing that, as an alternate ground for its appeal, the court of appeals had jurisdiction over the order pursuant to R.C. 2505.02(B)(2) as an order that affected a substantial right made in a special proceeding, or pursuant to R.C. 2505.02(B)(4) as an order that denied a provisional remedy. Middletown also argued that the lack of Civ.R. 54(B) certification by the trial court did not deprive the court of appeals of jurisdiction.

In its opinion, the court of appeals denied both of Stevens's motions to dismiss. The court of appeals found that it had jurisdiction over the appeal pursuant to R.C. 2505.02(B)(2), finding that the trial court order denying statutory immunity affected a "substantial right" and was entered in a "special proceeding," and so denied Stevens's second motion to dismiss for that reason. The court of appeals found that the underlying action was a "civil claim for wrongful death and survivorship," both of which were unknown at common law and "did not exist in law or equity prior to 1853," so that a special proceeding was involved within the meaning of R.C. 2505.02(A)(2).

The court of appeals therefore did not specifically rule on Stevens's argument, raised within her second motion to dismiss, that it had no jurisdiction pursuant to R.C. 2744.02(C) in the wake of the *Sheward* decision. Furthermore, because it

based its jurisdiction on R.C. 2505.02(B)(2), the court of appeals denied Stevens's first motion to dismiss, relating to retroactivity of R.C. 2744.02(C), as moot.

After thus finding Middletown's appeal properly before it, the court of appeals reversed the judgment of the trial court on the merits and entered summary judgment in favor of Middletown, finding that the municipality was entitled to political subdivision immunity. The court of appeals held as a matter of law that the edge drop at issue did not constitute a nuisance within the meaning of R.C. 2744.02(B)(3), so that Middletown could not be liable for an alleged failure to keep the roadway free from nuisance.

Finding its judgment on the merits issue to be in conflict with the judgment of the Fifth District Court of Appeals in *Thompson v. Muskingum Cty. Bd. of Commrs.* (Nov. 12, 1998), Muskingum App. No. CT98–0010, unreported, 1998 WL 817826, the court of appeals granted Stevens's motion to certify a conflict. The issue certified is "whether an edge drop on the berm of a county or city road, in and of itself, constitutes a nuisance within the meaning of R.C. 2744.02(B)(3)." In *Thompson,* the Fifth District Court of Appeals found that whether the edge drop between the pavement and the berm is a nuisance for purposes of R.C. 2744.02(B)(3) is a factual question, relying on *Dickerhoof,* 6 Ohio St.3d 128, 6 OBR 186, 451 N.E.2d 1193. Thus, the court of appeals in *Thompson* refused to adopt the position adopted by the court of appeals in the case *sub judice,* which is that an edge drop cannot be a "nuisance" as that term is used in R.C. 2744.02(B)(3).

Stevens also moved the court of appeals to certify a conflict on the issue of whether, in the wake of the *Sheward* decision, a court of appeals has jurisdiction pursuant to R.C. 2744.02(C) to hear an interlocutory appeal from the denial of a political subdivision's summary judgment motion based upon statutory immunity. The court of appeals declined to certify a conflict on that issue.

The cause is now before this court upon our determination that a conflict exists on the edge-drop issue (case No. 00–513), and pursuant to the allowance of a discretionary appeal (case No. 00–225).

## II

### Appellate Court Jurisdiction

#### A

#### Standards for Appealability

Section 3(B)(2), Article IV of the Ohio Constitution limits the appellate jurisdiction of the courts of appeals to the review of judgments and final orders of lower courts. Section 3(B)(2), Article IV provides:

"Courts of appeals shall have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district and shall have such appellate jurisdiction as may be provided by law to review and affirm, modify, or reverse final orders or actions of administrative officers or agencies."

The initial issue for resolution, as a prerequisite to any consideration of the merits of this case, is whether the trial court order denying Middletown's motion for summary judgment premised on immunity under R.C. Chapter 2744 was a final appealable order. If this order was not a final appealable order, the court of appeals was without jurisdiction to entertain the appeal, and should have dismissed it without reaching the merits.

The denial of a motion for summary judgment generally is considered an interlocutory order not subject to immediate appeal. See *Celebrezze v. Netzley* (1990), 51 Ohio St.3d 89, 90, 554 N.E.2d 1292, 1293–1294. See, also, *State ex rel. Overmeyer v. Walinski* (1966), 8 Ohio St.2d 23, 37 O.O.2d 358, 222 N.E.2d 312. In this case, Middletown argues that at least one exception to this general rule applies, so that the trial court order at issue was subject to an immediate appeal.

B

Appealability Pursuant to R.C. 2505.02(B)

The court of appeals in this case specifically determined that R.C. 2505.02(B)(2) provided the basis for appellate jurisdiction. Therefore, we first consider the propriety of that determination.

R.C. 2505.02(B) provides that "[a]n order is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial, when it is one of the following:

"* * *

"(2) An order that affects a substantial right made in a special proceeding * * *."

R.C. 2505.02(A)(1) defines "substantial right" as "a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect."

R.C. 2505.02(A)(2) defines "special proceeding" as "an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity."

In *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 108, 616 N.E.2d 213, 218, fn. 8, this court noted that in considering whether a particular order affected a substantial right in a special proceeding, the reviewing court's analysis first

focuses on the special proceeding portion of the inquiry. Only if it is first determined that an order was entered in a special proceeding is it necessary to go on to consider whether the order affected a substantial right.

This court held in *Polikoff*, at the syllabus, that "[o]rders that are entered in actions that were recognized at common law or in equity and were not specially created by statute are not orders entered in special proceedings pursuant to R.C. 2505.02."

In *Polikoff*, 67 Ohio St.3d at 104, 616 N.E.2d at 216, this court quoted from *Missionary Soc. of M.E. Church v. Ely* (1897), 56 Ohio St. 405, 407, 47 N.E. 537, 538: "[A]ny ordinary proceedings in a court of justice, by which a party prosecutes another for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense, involving the process and pleadings, and ending in a judgment, is an action, while every proceeding other than an action, where a remedy is sought by an original application to a court for a judgment or an order, is a special proceeding."

Furthermore, *Polikoff*, 67 Ohio St.3d at 105, 616 N.E.2d at 216, quoted *In re Estate of Wyckoff* (1957), 166 Ohio St. 354, 358, 2 O.O.2d 257, 260, 142 N.E.2d 660, 663–664, which in turn had quoted *Schuster v. Schuster* (1901), 84 Minn. 403, 407, 87 N.W. 1014, 1015, for the proposition that " ' "[w]here the law confers a right, and authorizes a special application to a court to enforce it, the proceeding is special, within the ordinary meaning of the term 'special proceedings.' " ' "

The *Polikoff* court, 67 Ohio St.3d at 105, 616 N.E.2d at 216, went on to again quote *Wyckoff*, 166 Ohio St. at 358, 2 O.O.2d at 260, 142 N.E.2d at 664, with approval: " '[T]he proceeding provided by [the statute at issue], in connection with which a petition and no other pleadings are required and wherein there is notice only, without service of summons, and which represents essentially an independent judicial inquiry, is a special proceeding.' "

In *Walters v. The Enrichment Ctr. of Wishing Well, Inc.* (1997), 78 Ohio St.3d 118, 121, 676 N.E.2d 890, 893, this court clarified the syllabus paragraph of *Polikoff*: "The determining factor of *Polikoff* is whether the 'action' was recognized at common law or in equity and not whether the 'order' was so recognized. In making the determination courts need look only at the underlying action."

For our purposes here, the key term in this statement is that the *underlying action* must be the focus of the inquiry.

The court of appeals below, in ruling that a case seeking recovery for a wrongful death is a special proceeding, did not adequately address what the true "underlying action" was in the case before it, and so reached its conclusion through an analysis that strayed from the correct focus of the inquiry. This case, although it includes claims for wrongful death and survival claims, is an ordinary

civil action seeking damages for purposes of R.C. 2505.02. The fact that a case involves an alleged wrongful death does not transform it into a special proceeding.

R.C. Chapter 2125 is commonly denominated under the heading "Action for Wrongful Death." See heading to R.C. Chapter 2125 in both Baldwin's Ohio Revised Code Annotated and Page's Ohio Revised Code Annotated. The "action" referred to in this sense is a civil action for damages. It is apparent that R.C. Chapter 2125 does not give rise to a special proceeding in the sense that that term is used in *Ely, Schuster, Wyckoff,* and *Polikoff.* R.C. Chapter 2125 does not provide for a remedy to be sought through "an original application to a court for a judgment or an order" (*Ely,* 56 Ohio St. at 407, 47 N.E. at 538), it does not authorize "a special application to a court to enforce" a right (*Schuster,* 84 Minn. at 407, 87 N.W. at 1015), and it does not provide for what is "essentially an independent judicial inquiry" (*Wyckoff,* 166 Ohio St. at 358, 2 O.O.2d at 260, 142 N.E.2d at 664).

R.C. Chapter 2125 details measures for pursuing a wrongful-death recovery within an ordinary action for money damages. R.C. 2125.01 provides that someone who causes the wrongful death of another "shall be liable to an action for damages, notwithstanding the death of the person injured."[1] This provision does not "specially create" an action or proceeding that was not recognized at common law or in equity within the meaning of *Polikoff* or of R.C. 2505.02(A)(2). Thus, it does not establish the requirements that would be necessary for a case involving a wrongful death to be a special proceeding. In the same way, no other provision within R.C. Chapter 2125 establishes the necessary requirements.

When a court considers whether a particular statute specially creates an action or proceeding that may qualify as a special proceeding for purposes of R.C. 2505.02, the court must pointedly examine the basic core of the statute at issue. The court must specifically ask whether the particular statute actually does create a special proceeding, or whether the statute merely supplies details within the structure of an ordinary action.

If an action has the characteristics of an ordinary action it does not qualify as a special proceeding. See *Polikoff,* 67 Ohio St.3d at 107, 616 N.E.2d at 218: "[Plaintiffs] sought redress of an alleged wrong by filing a lawsuit in the court of common pleas. * * * The underlying action can be distinguished from a special proceeding in that it provides for an adversarial hearing on the issues of fact and law which arise from the pleadings and which will result in a judgment for the

---

1. Am.Sub.H.B. No. 350 attempted to amend R.C. 2125.01. However, we do not identify the statute as "former," because H.B. 350 was declared unconstitutional in its entirety in *Sheward,* which had the effect of invalidating the amendment to R.C. 2125.01. See *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 509, 721 N.E.2d, 1020, 1023, fn. 1.

prevailing party." See, also, *Walters*, 78 Ohio St.3d at 122, 676 N.E.2d at 893: "In the case *sub judice*, the underlying action was an ordinary civil action, seeking damages. It was recognized at common law and hence was not a special proceeding."

As in both *Polikoff* and *Walters*, the order at issue in this case was not entered in a special proceeding. The "underlying action" is an ordinary civil suit for damages, which of course was known at common law.

Although we have focused on the consideration that the true underlying action in this case was recognized at common law, there is another aspect of R.C. 2505.02 and *Polikoff* that indicates that the trial court order in this case was not entered in a special proceeding. Both R.C. 2505.02(A)(2) and *Polikoff's* syllabus paragraph require that a special proceeding be one "specially *created* by statute." (Emphasis added.)

In *Thompson v. Wing* (1994), 70 Ohio St.3d 176, 181, 637 N.E.2d 917, 921, a majority of this court, by quoting *Griffiths v. Earl of Dudley* (1882), 9 Q.B.Div. 357, 363, seemed to accept, at least by implication, that R.C. Chapter 2125 does not "'give any new cause of action, but only substitute[s] the right of the representative to sue in the place of the right which the deceased himself would have had if he had survived.'" See *Thompson*, 70 Ohio St.3d at 186, 637 N.E.2d at 925 (Douglas, J., concurring in judgment).

Therefore, the explicit requirement that a special proceeding be "specially created by statute" does not appear to be fulfilled in this case, as R.C. Chapter 2125 does not create a right of action for wrongful death.

Also, there is a further obstacle to a wrongful-death action being a special proceeding, separate from those discussed above. R.C. 2505.02(A)(2) requires that for a proceeding to be special, it must be one "that prior to 1853 was not denoted as an action at law or a suit in equity." Ohio's first wrongful-death statute, as this state's version of what is commonly called Lord Campbell's Act, was enacted in 1851. See 49 Ohio Laws 117. Today's wrongful-death statute contains the essential provisions of the 1851 statute.

Because a wrongful-death recovery was delineated by statute in 1851, an action for wrongful death *was* denoted as an action at law prior to 1853 for purposes of R.C. 2505.02(A)(2). Hence the precise statutory definition of special proceeding is not met for that reason.

Because we have found that there is no special proceeding at issue in this case, we need not specifically consider whether the order appealed from affected a substantial right. See *Polikoff*, 67 Ohio St.3d at 108, 616 N.E.2d at 218, fn. 8.

Having found that R.C. 2505.02(B)(2) does not confer jurisdiction on the court of appeals in this case, we further find that no other provision in R.C. 2505.02(B) supports the appeal.

For all the foregoing reasons, we hold that a trial court order entered in a civil action for damages seeking recovery for a wrongful death is not an order entered in a special proceeding for purposes of R.C. 2505.02. We reverse the judgment of the court of appeals on this issue.

Our conclusion that an order denying a motion for summary judgment in a civil action for damages involving a wrongful death is not an order entered in a special proceeding for purposes of R.C. 2505.02(B)(2) offers some consistency in an area of law that is frequently fraught with inexplicable discrepancies. It would be anomalous to hold that such an order would not be a final order in a case involving a personal injury, but would be one in a case involving a wrongful death, when the actions are so similar and are conducted procedurally in much the same manner. If a particular order is not appealable in a personal injury case, the same order should not be appealable in a wrongful-death case. We emphasize that, to qualify as a special proceeding, a particular proceeding must have the characteristics that indicate that an independent judicial inquiry is taking place. These characteristics are not present in the case *sub judice*.

## C

### Appealability Pursuant to R.C. 2744.02(C)

Because we have found that R.C. 2505.02(B) does not support appellate jurisdiction in this case, we proceed to consider whether R.C. 2744.02(C) provides an alternative ground for the court of appeals to exercise appellate jurisdiction.

### 1

### Am.Sub.H.B. No. 350 and the Ramifications of *Sheward*

Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867, was signed into law by former Governor George Voinovich on October 28, 1996, and took effect on January 27, 1997. Am.Sub.H.B. No. 350 purported to amend, enact, or repeal "over one hundred sections of the Ohio Revised Code 'relative to changes in the laws pertaining to tort and other civil actions.'" See *Sheward*, 86 Ohio St.3d at 458, 715 N.E.2d at 1073, fn. 6, quoting the title of the Act. One of the purported new enactments of Am.Sub.H.B. No. 350 was R.C. 2744.02(C), which provided that "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in Chapter 2744. or any other provision of the law is a final order." 146 Ohio Laws, Part II, 3989.

Am.Sub.H.B. No. 350 also purported to amend R.C. 2501.02 to grant jurisdiction to courts of appeals "upon an appeal upon questions of law to review, affirm, modify, set aside, or reverse judgments or final orders of courts of record inferior to the court of appeals within the district, * * * INCLUDING AN ORDER DENYING A POLITICAL SUBDIVISION OR AN EMPLOYEE OF A POLITICAL SUBDIVISION THE BENEFIT OF AN ALLEGED IMMUNITY FROM LIABILITY AS PROVIDED IN CHAPTER 2744. OR ANOTHER PROVISION OF THE REVISED CODE, for prejudicial error." *Id.* at 3982. (Am.Sub.H.B. No. 350 purported to add the phrase capitalized above to the previous version of R.C. 2501.02 in effect at that time.)

The reason we use the word "purported" in the above descriptions to refer to the legislative actions contained within Am.Sub.H.B. No. 350 is that in *Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062, at paragraph three of the syllabus, this court held that "Am.Sub.H.B. No. 350 violates the one-subject provision of Section 15(D), Article II of the Ohio Constitution, and is unconstitutional *in toto.*" The one-subject rule holding reflected in paragraph three of the syllabus of *Sheward* was based on an "ancillary" claim raised in that case as part of relators' attempt to have Am.Sub.H.B. No. 350 declared unconstitutional in its entirety and to have its implementation enjoined. See 86 Ohio St.3d at 452, 715 N.E.2d at 1069.

In *Sheward,* this court thus struck down all legislative action contained within Am.Sub.H.B. No. 350, including the attempted enactment of R.C. 2744.02(C) and the attempted amendment of R.C. 2501.02.

After the decision in *Sheward* was announced, this court issued a series of entries in cases implicating R.C. 2744.02(C), resolving them on authority of *Sheward,* and indicating that the law regarding appealability of orders denying statutory immunity to political subdivisions and employees of political subdivisions had returned to the law that existed prior to Am.Sub.H.B. No. 350's attempt to change it. See, *e.g., Burger v. Cleveland Hts.* (1999), 87 Ohio St.3d 188, 718 N.E.2d 912; *Estate of Weitzel v. Cuyahoga Falls* (1999), 87 Ohio St.3d 200, 718 N.E.2d 921; *Braden v. Cleveland Bd. of Edn.* (1999), 87 Ohio St.3d 206, 718 N.E.2d 924; *Hubbard v. Canton City School Bd. of Edn.* (2000), 88 Ohio St.3d 14, 722 N.E.2d 1025.

2

Am.Sub.H.B. No. 215 and "Reenactment"

In one of the cases mentioned above, *Hubbard,* two justices dissented from the entry vacating the opinion of the court of appeals for lack of a final appealable order. In the *Hubbard* dissent, the following statement was made:

"Whether the judgment of the trial court denying immunity is final and appealable depends on whether R.C. 2744.02(C) was validly reenacted by the General Assembly in Am.Sub.H.B. No. 215, given that R.C. 2744.02(C) was declared unconstitutional as being part of Am.Sub.H.B. No. 350. That is, if Am.Sub.H.B. No. 215 validly reenacted this section, then the trial court's decision denying immunity to the board of education would be final, and the jurisdiction of the court of appeals would not be questioned by this court." 88 Ohio St.3d at 15, 722 N.E.2d at 1026 (Cook, J., dissenting).

Am.Sub.H.B. No. 215, effective June 30, 1997, contained an amendment to R.C. 2744.02(B)(2), which deals with the liability of political subdivisions for negligent acts by their employees with respect to proprietary functions. The sole purpose of the amendment was to insert a reference to a statute (R.C. 3314.07) that was not previously mentioned within R.C. 2744.02(B)(2). Am.Sub.H.B. No. 215 made no other changes to R.C. 2744.02.[2] 147 Ohio Laws, Part I, 1149–1150.

Section 15(D), Article II of the Ohio Constitution requires that "[n]o law shall be revived or amended unless the new act contains the entire act revived, or the section or sections amended, and the section or sections amended shall be repealed."

Consistent with this provision, Am.Sub.H.B. No. 215, in amending R.C. 2744.02(B)(2), reprinted the entire version of R.C. 2744.02 thought to be in existence at the time, including R.C. 2744.02(C) as purportedly enacted in Am.Sub.H.B. No. 350.

Middletown argues that, because Am.Sub.H.B. No. 215 amended R.C. 2744.02(B)(2) in compliance with the requirement of Section 15, Article II, the General Assembly thereby "enacted" an entirely new R.C. 2744.02 (including a new R.C. 2744.02[C] ) in Am.Sub.H.B. No. 215. Middletown argues that, because *Sheward* found Am.Sub.H.B. No. 350 unconstitutional, and therefore the version of R.C. 2744.02(C) that the bill attempted to enact unconstitutional as well, then R.C. 2744.02(C) was never truly "enacted" until Am.Sub.H.B. No. 215 enacted the statute, because everything in Am.Sub.H.B. No. 350 was a nullity.

In a related vein, Middletown argues that, pursuant to Section 15, Article II, the General Assembly's actions within Am.Sub.H.B. No. 215 should be viewed as a "repeal" in its entirety of the version of R.C. 2744.02 believed to be in effect at the time. According to this "reenactment" argument, the act therefore repealed the version of R.C. 2744.02(C) that this court found unconstitutional in *Sheward*, and replaced it with a later version of R.C. 2744.02(C) that was free of the constitutional infirmity that had caused Am.Sub.H.B. No. 350 to be struck down

---

2. Am.Sub.H.B. No. 215 made no changes to the version of R.C. 2501.02 purportedly in effect at the time after that statute's attempted amendment by Am.Sub.H.B. No. 350.

in *Sheward*. But, see, *Simmons–Harris v. Goff* (1999), 86 Ohio St.3d 1, 14–17, 711 N.E.2d 203, 214–216.

While the reenactment argument exposes an ambiguity and is plausible on its face, serious deficiencies in the argument emerge when its specifics are considered.

## 3

### The Intent of the General Assembly

The essential goal of statutory construction is to give effect to the intent of the General Assembly. See *Carter v. Youngstown* (1946), 146 Ohio St. 203, 32 O.O. 184, 65 N.E.2d 63, paragraph one of the syllabus. The intent may be inferred from the particular wording the General Assembly has chosen to set forth the substantive terms of a statute. See *Wachendorf v. Shaver* (1948), 149 Ohio St. 231, 36 O.O. 554, 78 N.E.2d 370, paragraph five of the syllabus. Intent may also be revealed in the procedural passage of the legislative act under consideration, when that body passes legislation that enacts, amends, or repeals a statute. See *State v. Wilson* (1997), 77 Ohio St.3d 334, 336–337, 673 N.E.2d 1347, 1350; see, also, *State ex rel. Durr v. Spiegel* (1914), 91 Ohio St. 13, 22, 109 N.E. 523, 525; *In re Hesse* (1915), 93 Ohio St. 230, 235, 112 N.E. 511, 512 (both determining intent of General Assembly by considering the way the statute at issue was amended).

Thus, for Am.Sub.H.B. No. 215 to successfully enact or reenact R.C. 2744.02(C), the General Assembly must have intended the act to have that effect. It is readily apparent that no such intent was present. At the time Am.Sub.H.B. No. 215 was passed, the General Assembly had no reason to believe that the purported enactment of R.C. 2744.02(C), attempted a short time earlier in Am.Sub.H.B. No. 350, would later be found to be unsuccessful. It is clear that while the General Assembly intended to make a minor amendment in Am.Sub. H.B. No. 215 to R.C. 2744.02(B), the General Assembly did not intend to take any action whatsoever with regard to R.C. 2744.02(C).

R.C. 101.53 (formerly 101.52, see 1998 H.B. No. 649, 147 Ohio Laws, Part III, 5043), provides:

"Bills shall be printed in the exact language in which they were passed, under the supervision of the clerk of the house in which they originated. New matter shall be indicated by capitalization and old matter omitted by striking through such matter. Prior capitalization in a Revised Code section shall be indicated by italicized type."

The editor's comment in Baldwin's Ohio Revised Code Annotated to Section 15, Article II of the Ohio Constitution makes some relevant comments regarding

R.C. 101.53, and indicates a relationship between that statute and Section 15(D), Article II:

"When amending a law or reviving a law previously repealed many legislative bodies include in the act only the desired amending language or words of revivor, which can be confusing because the language does not appear in context with the law amended or revived. The General Assembly is prohibited from this practice by division (D) of this section, which also requires that the act repeal the amended section. R.C. 101.52 (now R.C. 101.53) provides devices for showing changes in context in the printed bill or act: matter to be deleted is shown struck through, and new matter to be inserted is shown in capital letters."

The printing format of Am.Sub.H.B. No. 215 indicates no intent to reenact or enact R.C. 2744.02(C). R.C. 2744.02(C) appears in the printed act in regular type, without the capitalization that would indicate new material pursuant to R.C. 101.53.

R.C. 1.54 provides: "A statute which is reenacted or amended is intended to be a continuation of the prior statute and not a new enactment, so far as it is the same as the prior statute." In *In re Hesse,* 93 Ohio St. at 234, 112 N.E. at 512, this court stated:

"Section 16 [now Section 15(D) ], Article II of the Constitution, requires that where a law is amended, the new act shall contain the section or sections amended, and the section or sections so amended shall be repealed. In compliance with this the general assembly, when it amended [the statute at issue], did repeal the section as it existed prior thereto. It is to be remembered that the only change made in the statute was the addition of two classes of misdemeanors. The provisions contained in the act as amended which were in the original act are not considered as repealed and again reenacted, but are regarded as having been continuous and undisturbed by the amendatory act. *In re Allen* [1915], 91 Ohio St. 315 [320–321, 110 N.E. 535, 537]."

In *Weil v. Taxicabs of Cincinnati, Inc.* (1942), 139 Ohio St. 198, 206, 22 O.O. 205, 208, 39 N.E.2d 148, 152, this court stated:

"The courts have generally held, notwithstanding this [current Section 15(D), Article II] and similar constitutional provisions, that where an act is amended, the part of the original act which remains unchanged is to be considered as having continued in force as the law from the time of its original enactment, and new portions as having become the law only at the time of the amendment. Black on Interpretation of Laws (2d Ed.) 579 and 582, Sections 168 and 169; 1 Sutherland Statutory Construction (2d Ed.) 441 and 445, Sections 237 and 238; *McKibben v. Lester* [1859], 9 Ohio St. 627 [1859 WL 40]; *State ex rel. McLaughlin v. City of Newark* [1894], 57 N.J.L. 298, 30 A. 543.

"The court in the last cited case says that 'by observing the constitutional form of amending a section of a statute, the Legislature does not express an intention then to enact the whole section as amended, but only an intention then to enact the change which is indicated. Any other rule of construction would surely introduce unexpected results and work great inconvenience.'" See, also, *In re Petition to Annex 320 Acres to the Village of S. Lebanon* (1992), 64 Ohio St.3d 585, 595, 597 N.E.2d 463, 470, citing *In re Allen,* 91 Ohio St. at 320–321, 110 N.E. at 537, for the proposition that "when a statute is amended the part that remains unchanged is to be considered as having continued as the law from the time of its original enactment."

As the preceding discussion illustrates, Section 15(D), Article II sets out the form for the General Assembly to follow when amending a statute, but cases such as *Hesse, Allen,* and *Weil* explain the substantive significance of what is occurring, and give guidance for ascertaining the intent of the General Assembly when an amendment to a specific statute is contained within a particular act.

In accordance with these precedents, it is apparent that R.C. 2744.02(C) continued forward as purportedly enacted in Am.Sub.H.B. No. 350, despite Middletown's arguments based on Section 15(D), Article II. Clearly, the General Assembly did not intend to reenact R.C. 2744.02(C) in Am.Sub.H.B. No. 215. Therefore, that act neither reenacted nor enacted R.C. 2744.02(C). When this court in *Sheward* struck down Am.Sub.H.B. No. 350, it struck down the version of R.C. 2744.02(C) that Am.Sub.H.B. No. 350 attempted to enact, and R.C. 2744.02(C) remains invalid as a result of *Sheward.*

For all the foregoing reasons, we hold that R.C. 2744.02(C), as purportedly enacted in Am.Sub.H.B. No. 350, is invalid. Furthermore, R.C. 2744.02(C) was neither enacted nor reenacted by Am.Sub.H.B. No. 215. *Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062, paragraph three of the syllabus, and *Hubbard,* 88 Ohio St.3d 14, 722 N.E.2d 1025, followed.

## III

### Conclusion

Neither R.C. 2505.02(B) nor R.C. 2744.02(C) provided a valid basis for the court of appeals to exercise jurisdiction to entertain Middletown's appeal. Therefore, the court of appeals should have dismissed the appeal without reaching the merits of this case. Consequently, we vacate the decision of the court of appeals on the merits. See *Walters,* 78 Ohio St.3d at 123, 676 N.E.2d at 894. Since the court of appeals was without jurisdiction to reach the merits of the appeal, we

likewise may not reach the merits.[3]

Accordingly, the judgment of the court of appeals as to its jurisdiction is reversed, the judgment of the court of appeals on the merits of the appeal is vacated, and this cause is remanded to the trial court for further proceedings.

*Judgment reversed*
*and cause remanded.*

DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., concur separately.

MOYER, C.J., and COOK, J., concur in part.

---

LUNDBERG STRATTON, J., concurring. I reluctantly concur with the determination in Part II C of the majority opinion that R.C. 2744.02(C) was neither enacted nor reenacted by 1997 Am.Sub.H.B. No. 215, because, based upon the format of the language of R.C. 2744.02 in H.B. 215, it was apparent that the General Assembly merely amended a section of the statute and did not enact or reenact a new law and repeal the old one. No one has disputed the General Assembly's authority to determine when issues involving immunity may be appealed. Had the majority in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, merely severed those sections in 1996 Am.Sub.H.B. No. 350 that violated the one-subject rule, I believe that R.C. 2744.02(C) would have remained a valid enactment.

I did not agree with the majority in *Sheward* that the bill in its entirety was unconstitutional. In particular, I expressed the opinion that even if certain provisions violated the one-subject rule of the Constitution, those offending provisions should be severed without striking the entire Act. *Id.* at 539, 715 N.E.2d at 1128 (Lundberg Stratton, J., dissenting). This case presents a perfect example of the chaos resulting from *Sheward.*

The General Assembly clearly intended to provide a political subdivision or an employee of a political subdivision the ability to immediately appeal from an order that denied the benefit of an alleged immunity from liability and enacted R.C. 2744.02(C) as part of H.B. 350. The city cites strong public policy in support of this law. Nevertheless, with no analysis of the constitutional viability of R.C. 2744.02(C) itself, the statute was struck down in *Sheward* merely because it was part of the overall tort reform bill.

---

3. *Haynes v. Franklin* (Sept. 25, 2000), Warren App. No. CA2000-03-025, unreported, 2000 WL 1371000, discretionary appeal and certified conflict allowed today, case Nos. 00–2004 and 00–2141, presents this court with an opportunity to address the edge-drop issue on the merits.

Nevertheless, I am constrained to agree that, based upon the technical requirements in the bill-making process, R.C. 2744.02(C) was neither enacted nor reenacted by H.B. 215. Therefore, I concur.

MOYER, C.J., concurs in the foregoing concurring opinion.

---

COOK, J., concurring in part. I agree with the syllabus paragraphs and with most of the majority's reasoning. I respectfully disagree, however, with two points the majority suggests and with the majority's characterization of the disposition of this case.

First, the majority states that "in considering whether a particular order affected a substantial right in a special proceeding, the reviewing court's analysis first focuses on the special proceeding portion of the inquiry. Only if it is first determined that an order was entered in a special proceeding is it necessary to go on to consider whether the order affected a substantial right." To constitute a final appealable order under R.C. 2505.02(B)(2), the order at issue must be "[a]n order that affects a substantial right" and must have been "made in a special proceeding." Given that there is no statutory basis for the sequential inquiry set forth in dicta in *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 108, 616 N.E.2d 213, 218, fn. 8, and again by the majority today, and given that the failure of either prong of the two-part inquiry would yield a resolution regarding appealability, I conclude that a reviewing court may address either the substantial right inquiry or the special proceeding inquiry first.

Second, in holding that this case involves an ordinary civil action for damages and not a special proceeding, the majority refers to the headings to R.C. Chapter 2125 contained in both Baldwin's Ohio Revised Code Annotated and Page's Ohio Revised Code Annotated. But R.C. 1.01 provides that "Title, Chapter, and section headings and marginal General Code section numbers do not constitute any part of the law as contained in the 'Revised Code.'" One member of this court has explained the character of such headings as follows:

"[H]eadings are publisher's aids to the user of the code. [They are not] part of the code; [they are not] official. 'In Ohio, the General Assembly does not assign official Revised Code headings, or taglines; they are written by the Publisher's editorial staff.' Baldwin's Ohio Legislative Service (1994), User's Guide, 4. 'Where new sections have been added to the Revised Code without official headings, descriptive headings have been supplied by the publisher's editorial staff.' Page's Revised Code Annotated (1990), Preface, vi." *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.* (1994), 70 Ohio St.3d 281, 286, 638 N.E.2d 991, 995, fn. 1 (Resnick, J., concurring).

Therefore, I decline to join this cumulative point of analysis.

Finally, the procedural disposition of this case is redundant. The majority reverses the court of appeals' determination of its jurisdiction, vacates its order as to the merits of the underlying appeal, and remands the cause to the trial court for further proceedings. This court has in the past most often merely vacated courts of appeals' orders when no final appealable order exists. See, *e.g.*, *Walters v. The Enrichment Ctr. of Wishing Well, Inc.* (1997), 78 Ohio St.3d 118, 676 N.E.2d 890; *Hitchings v. Weese* (1997), 77 Ohio St.3d 390, 674 N.E.2d 688; *State v. Lambert* (1994), 69 Ohio St.3d 356, 632 N.E.2d 511; *State v. Crago* (1990), 53 Ohio St.3d 243, 559 N.E.2d 1353. This is so because by vacating for want of jurisdiction the judgment of the court of appeals, we implicitly overturn that court's determination regarding its jurisdiction. Therefore, I believe that the correct disposition of this case is simply to vacate the judgment of the court of appeals and to remand this cause to the trial court for further proceedings.

Accordingly, with the exception of the three foregoing points, I concur in the majority's reasoning and consequent disposition of this cause.

MOYER, C.J., concurs in the foregoing opinion.

---

*Ted L. Wills, Howard M. Schwartz* and *Marc D. Mezibov,* for appellant.

*Robert J. Gehring* and *Leslie S. Landen,* Middletown Law Director, for appellee.

*Arthur, O'Neil, Mertz & Bates Co., L.P.A.,* and *Joseph W. O'Neil,* urging reversal for *amicus curiae* Ohio Academy of Trial Lawyers.

*John E. Gotherman, Barry M. Byron* and *Stephen L. Byron,* urging affirmance for *amicus curiae* Ohio Municipal League.

*Isaac, Brant, Ledman & Teetor, Mark Landes* and *Paul A. Mackenzie,* urging affirmance for *amici curiae* County Commissioners' Association of Ohio and County Engineers' Association of Ohio.

---

TOMEI, A MINOR, F.K.A. ABOUHASSAN, APPELLEE, *v.*
MAYFIELD CITY SCHOOLS, APPELLANT, ET AL.

[Cite as *Tomei v. Mayfield City Schools* (2001), 91 Ohio St.3d 198.]

(No. 00–460—Submitted February 28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Patrick M. Dukes*, for appellant.

*Zashin & Rich Co., L.P.A., Jonathan A. Rich* and *Stephen S. Zashin*, for appellee.

JOHNSON, APPELLEE, *v.* GREENE COUNTY DRUG TASK FORCE ET AL., APPELLANTS.

[Cite as *Johnson v. Greene Cty. Drug Task Force* (2001), 91 Ohio St.3d 199.]

(Nos. 00–472 and 00–481—Submitted November 29, 2000—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed because there is a want of a final appealable order.  *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Gregory A. Shell*, for appellee.

*Suzanne M. Schmidt,* Greene County Assistant Prosecuting Attorney, Civil Division, for appellant Greene County Drug Task Force.

*Jenks, Surdyk & Cowdrey Co., L.P.A.,* and *Jeffrey C. Turner,* for appellants Richard Bishop, William Schenck, David Mesaros, Robert Hendrix, Greene County Prosecutor's Office, Greene County Sheriff's Office, and Detective Larry Fletcher.

*Freund, Freeze & Arnold, Neil F. Freund* and *Lynnette Pisone Ballato,* for appellants city of Xenia and Detective Richard Thomas.

*Bieser, Greer & Landis, L.L.P., James H. Greer* and *Joseph C. Oehlers,* for appellant city of Fairborn.

*Dinsmore & Shohl, L.L.P.,* and *Gary E. Becker,* for appellant city of Beavercreek.

*John E. Gotherman, Barry M. Byron* and *Stephen L. Byron,* urging reversal for *amicus curiae,* Ohio Municipal League.

*Bricker & Eckler L.L.P., Kurtis A. Tunnell* and *Anne Marie Sferra,* urging reversal for *amicus curiae,* County Commissioners Association of Ohio.

*Law Offices of Nicholas E. Subashi, Nicholas E. Subashi* and *David J. Arens,* urging reversal for *amicus curiae,* Ohio Association of Civil Trial Attorneys.

*Betty D. Montgomery,* Attorney General, and *Arthur J. Marziale, Jr.,* Assistant Attorney General, urging reversal for *amicus curiae,* Ohio Attorney General.

*Reminger & Reminger Co., L.P.A.,* and *Nick C. Tomino,* urging reversal for *amicus curiae,* Ohio Government Risk Management Plan.

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *Kathleen A. Martin,* Assistant Prosecuting Attorney, urging reversal for *amici curiae,* Cuyahoga County and Ohio Prosecuting Attorneys Association.

*Walter & Haverfield, P.L.L., R. Todd Hunt* and *Barbara Marburger,* urging reversal for *amici curiae,* Ohio Association of Chiefs of Police, Ohio Township Association, and Cuyahoga County Law Directors' Association.

*Paul L. Cox,* Chief Counsel, urging reversal for *amicus curiae,* Fraternal Order of Police of Ohio, Inc.

*R. Sean Grayson,* General Counsel, and *Kimm A. Massengill,* Associate General Counsel, urging reversal for *amicus curiae,* Ohio Council 8, AFSCME, AFL–CIO.

WHITE ET AL., APPELLEES, *v.* CITY OF DAYTON, APPELLANT, ET AL.

[Cite as *White v. Dayton* (2001), 91 Ohio St.3d 201.]

(Nos. 00–553 and 00–554—Submitted February
28, 2001—Decided March 28, 2001.)

---

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Jeffrey R. McQuiston, Richard S. Skelton* and *Richard D. Donenfeld,* for appellees.

*J. Rita McNeil,* Director of Law; *Freund, Freeze & Arnold, Neil F. Freund* and *Lynnette Pisone Ballato,* for appellant.

SIMPSON, EXR., APPELLEE, *v.* CITY OF NILES POLICE
DEPARTMENT ET AL., APPELLANTS.

[Cite as *Simpson v. Niles Police Dept.* (2001), 91 Ohio St.3d 201.]

(Nos. 00–580 and 00–807—Submitted February
28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Reminger & Reminger Co., L.P.A.,* and *Nick C. Tomino,* for appellants.

CAIN, ADMR., APPELLEE, *v.* SIMPSON, ADMR., ET AL.; CITY OF NILES ET AL., APPELLANTS.

[Cite as *Cain v. Simpson* (2001), 91 Ohio St.3d 202.]

(Nos. 00–584 and 00–808—Submitted February
28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Reminger & Reminger Co., L.P.A.,* and *Nick C. Tomino,* for appellants.

COLEMAN ET AL., APPELLEES, *v.* CLEVELAND HEIGHTS/UNIVERSITY HEIGHTS SCHOOL BOARD, APPELLANT.

[Cite as *Coleman v. Cleveland Hts./Univ. Hts. School Bd.* (2001), 91 Ohio St.3d 203.]

(No. 00–632—Submitted February 28, 2001—Decided March 28, 2001.)

---

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Mondello & Levey, Scott Levey* and *Frank Giaimo,* for appellees.

*Shawn R. Pearson,* for appellant.

HALL, ADMR., APPELLEE, *v.* CUYAHOGA COUNTY ET AL., APPELLANTS.

[Cite as *Hall v. Cuyahoga Cty.* (2001), 91 Ohio St.3d 203.]

(Nos. 00–844 and 00–955—Submitted February 28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A., Richard L. Demsey* and *Kathleen St. John,* for appellee.

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *Kathleen A. Martin,* Litigation Manager, Civil Division, for appellant Cuyahoga County.

*Weston, Hurd, Fallon, Paisley & Howley, L.L.P.,* and *Christopher M. Ernst,* for appellant city of North Olmsted.

WITTEN, APPELLEE, *v.* CITY OF RICHMOND HEIGHTS ET AL., APPELLANTS.

[Cite as *Witten v. Richmond Hts.* (2001), 91 Ohio St.3d 204.]

(No. 00–917—Submitted February 28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Lester S. Potash,* for appellee.

*R. Todd Hunt,* Director of Law; *Walter & Haverfield, P.L.L., Jonathan D. Greenberg* and *Barbara R. Marburger,* for appellants.

TIGNOR, APPELLEE, *v.* FRANKLIN COUNTY BOARD OF COMMISSIONERS ET AL.; WHALEY, DEPUTY, APPELLANT.

[Cite as *Tignor v. Franklin Cty. Bd. of Commrs.* (2001), 91 Ohio St.3d 205.]

(No. 00–1013—Submitted February 28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Zach Zunshine,* for appellee.

*Hunter, Carnahan & Shoub, Robert.R. Byard* and *Russell E. Carnahan,* for appellant.

BENTON, APPELLEE, *v.* CUYAHOGA METROPOLITAN
HOUSING AUTHORITY ET AL., APPELLANTS.

[Cite as *Benton v. Cuyahoga Metro. Hous.
Auth.* (2001), 91 Ohio St.3d 206.]

(No. 00–1134—Submitted February 28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v.
Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG
STRATTON, JJ., concur.

*Willacy, LoPresti & Marcovy, Aubrey B. Willacy* and *Audrey H. Davis,* for
appellants.

BANNING ET AL., APPELLEES, *v.* LAKE COUNTY ET AL.; BASTER, APPELLANT.

[Cite as *Banning v. Lake Cty.* (2001), 91 Ohio St.3d 206.]

(No. 00–1183—Submitted February 28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v.
Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG
STRATTON, JJ., concur.

*Weston, Hurd, Fallon, Paisley & Howley, L.L.P., Hilary S. Taylor* and *Gary A. Vick, Jr.,* for appellant.

DRUM ET AL., APPELLEES, *v.* WASHLOCK ET AL.; MAYFIELD CITY BOARD OF EDUCATION, APPELLANT.

[Cite as *Drum v. Washlock* (2001), 91 Ohio St.3d 207.]

(No. 00–1706—Submitted February 28, 2001—Decided March 28, 2001.)

---

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Thomas J. Downs,* for appellant.

CONYNE ET AL., APPELLEES, *v.* CITY OF CINCINNATI, APPELLANT, ET AL.

[Cite as *Conyne v. Cincinnati* (2001), 91 Ohio St.3d 207.]

208

(No. 00–1928—Submitted February 28, 2001—Decided March 28, 2001.)

The judgment of the court of appeals is affirmed on the authority of *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 743 N.E.2d 901.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Manley, Burke & Lipton, Timothy M. Burke* and *Rhonda S. Frey,* for appellees.

*Fay D. Dupuis,* City Solicitor, and *Richard Ganulin,* Assistant City Solicitor, for appellant.

BOONE, APPELLANT, *v.* VANLINER INSURANCE COMPANY, APPELLEE.

[Cite as *Boone v. Vanliner Ins. Co.* (2001), 91 Ohio St.3d 209.]

(No. 00–104—Submitted October 18, 2000—Decided April 4, 2001.)

DOUGLAS, J. Appellant, Richard Boone, is an over-the-road truck driver and a resident of Ohio. Appellee, Vanliner Insurance Company ("Vanliner"), issued a commercial vehicle liability insurance policy to Boone, individually, and a separate policy to Boone's employer. Each policy of insurance provided $1,000,000 liability coverage. Boone's employer's policy also provided $1,000,000 uninsured/underinsured motorist coverage and Boone's policy listed uninsured/underinsured motorist coverage in the amount of $50,000.

On June 12, 1995, Boone was in Tampa, Florida, transporting goods for his employer when he was involved in a three-vehicle accident. Boone, driving a tractor-trailer, was travelling behind a dump truck driven by Robert Allison, when Brett Verona, the operator of the third vehicle, lost control while attempting to change lanes. Due to Verona's negligence, Allison was unable to prevent his vehicle from colliding with Verona's. Boone's attempt to avoid hitting Allison's truck was also unsuccessful.

As a result of the accident, Boone suffered serious injuries, including bilateral fractures of both knees. Verona's insurer paid $100,000, the limit of Verona's liability coverage, toward Boone's damages. Boone, alleging that his damages exceeded $100,000, subsequently sought underinsured motorist benefits from Vanliner through his employer's policy of insurance. Vanliner denied Boone's claim, asserting that an exclusion provision in the policy precluded underinsured motorist coverage with regard to Boone's accident.

On June 12, 1997, Boone brought a declaratory judgment action against Vanliner seeking a determination that his policy and his employer's policy of insurance with Vanliner each provided him with $1,000,000 in uninsured/underinsured motorist coverage. With regard to his individual policy, Boone alleged that he was entitled to $1,000,000 uninsured/underinsured coverage by operation of law because Vanliner had failed to obtain a written waiver of uninsured/underinsured coverage in an amount equal to his liability insurance as required by Ohio law. The complaint included a claim for bad faith,[1] alleging that Vanliner lacked reasonable justification for denying underinsured motorist coverage. To support his bad faith claim, Boone sought access, through discovery, to Vanliner's claims file.

In its answer to Boone's complaint, Vanliner denied that Boone was entitled to uninsured/underinsured motorist benefits under either policy. However, Vanliner subsequently changed its position and admitted that each policy of insurance provided Boone with $1,000,000 of uninsured/underinsured motorist coverage. Vanliner subsequently moved the court for a protective order with regard to numerous documents in its claims file. In its motion, Vanliner contended that several documents were protected from discovery by the attorney-client privilege and/or work-product doctrine.[2]

The trial court ordered Vanliner to submit its claims file to the court for an *in camera* inspection to determine which documents, if any, were protected from discovery. The claims file consists of 1,741 documents numbered "0" through "1741."[3] The trial court found that one hundred seventy-five of the documents

---

1. An insurer's lack of good faith in the processing of a claim is frequently referred to as "bad faith." Such conduct gives rise to a cause of action in tort against the insurer. *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, paragraph one of the syllabus.

2. The attorney-client privilege exempts from the discovery process certain communications between attorneys and their clients. The privilege has long been recognized by the courts, *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591; *Moskovitz, infra,* 69 Ohio St.3d at 660, 635 N.E.2d at 349, and "[i]ts purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn* at 389, 101 S.Ct. at 682, 66 L.Ed.2d at 591.

   Work product consists of "documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" and may be discovered only upon a showing of good cause. Civ.R. 26(B)(3). This rule is often referred to as the "work-product doctrine." The purpose of the work-product doctrine is "to prevent an attorney from taking undue advantage of his adversary's industry or efforts." Civ.R. 26(A)(2).

   Vanliner also argued that certain claims file documents were not discoverable because they were not relevant to the bad faith claim. The trial court did not accept this argument and Vanliner did not appeal that aspect of the trial court's ruling.

3. The claims file documents are actually stamped "000000" through "001741." Throughout this opinion reference to specific documents will be by number without the preceding zeros.

were protected from discovery and ordered Vanliner to release the unprotected documents to Boone.[4]  In determining which documents were protected, the trial court applied our ruling in *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, wherein we held that certain attorney-client communications and work-product materials in an insurer's claims file were not protected from discovery by the attorney-client privilege or work-product doctrine.

Upon appeal[5] to the Tenth District Court of Appeals, Vanliner argued that the trial court erred in applying *Moskovitz* and that, as a result, the trial court incorrectly ordered Vanliner to disclose thirty documents that are protected by the attorney-client privilege and/or work-product doctrine.  The court of appeals agreed with Vanliner's argument that *Moskovitz* was inapplicable.  Consequently, the court found that of the thirty claims file documents challenged on appeal, Vanliner was required to disclose only one in its entirety.  The court accepted Vanliner's argument that the remaining twenty-nine were privileged either in whole or in part.  Accordingly, the court of appeals affirmed in part and reversed in part the order of the trial court and remanded the cause to the trial court.[6]

This cause is now before this court pursuant to the allowance of a discretionary appeal.

The issue before us is whether, in an action alleging bad faith denial of insurance coverage, the insured is entitled to obtain, through discovery, claims

---

We also note that there is no document numbered 929 in the claims file.  According to Vanliner, this is due to a numbering error.

4.  The trial court held that the following documents were protected from discovery:  883, 884, 891, 893–895, 898, 910–928, 930, 932–984, 1015, 1033–1043, 1049, 1051–1077, 1085–1091, 1094–1098, 1101–1102, 1109–1114, 1124–1150, 1251, 1256, 1257, and 1258, and portions of documents numbered 858, 859, 861, and 862.

5.  While the issue was apparently not raised by appellant either in the court of appeals or in this court, we note in passing, and without deciding, that there could be a question of whether this case, involving solely a discovery issue, met the requirements for a final appealable order as set forth in R.C. 2505.02(B)(4) and, in particular, (B)(4)(b).

6.  Upon the court of appeals' remand of this case to the trial court, the trial court issued a new order, which stated, "Pursuant to the Court of Appeals' Decision rendered December 2, 1999, the Court's November 10, 1998 Entry is hereby modified to indicate that [Vanliner] must produce only the following documents contained in the claims file:  597, 598, 600, and 601 with requested redactions, and 599."

This entry of the trial court is misleading because the order says that it modifies the trial court's order of November 10, 1998, so that only five documents from the insurer's claims file must be produced.  However, the trial court's November 10, 1998 entry ordered Vanliner to produce over fifteen hundred claims file documents.  Vanliner appealed, and the court of appeals addressed, the trial court's November 10, 1998 order *only with respect to thirty documents*.  Thus, the entry upon remand should have reflected that it modified the November 10, 1998 entry only as to those documents at issue in the appeal.

file documents containing attorney-client communications and work product that may cast light on whether the denial was made in bad faith..

As already indicated, the trial court relied on our decision in *Moskovitz* to determine which claims file documents were protected from discovery. In *Moskovitz*, after receiving a substantial jury award for a medical malpractice claim, the plaintiffs sought prejudgment interest as authorized by R.C. 1343.03(C). *Id.*, 69 Ohio St.3d at 647–648, 635 N.E.2d at 340–341. To be successful in an R.C. 1343.03(C) proceeding, the prevailing party of the underlying case must prove, among other things, that the opposing party did not make a good faith effort to settle the case. With regard to this prong of R.C. 1343.03(C), *Moskovitz* sought to clarify the extent of a plaintiff's right to discovery of the malpractice insurer's claims file in light of the attorney-client privilege and the work-product doctrine. We stated that "[d]ocuments and other things showing the lack of a good faith effort to settle by a party or the attorneys acting on his or her behalf are wholly unworthy of the protections afforded by any claimed privilege." *Id.* at 661, 635 N.E.2d at 349. Thus, we held that "[i]n an R.C. 1343.03(C) proceeding for prejudgment interest, neither the attorney-client privilege nor the so-called work product exception precludes discovery of the contents of an insurer's claims file. The only privileged matters contained in the file are those that go directly to the theory of defense of the underlying case in which the decision or verdict has been rendered." *Id.* at paragraph three of the syllabus.

Boone argues that claims file materials showing an insurer's lack of good faith in determining coverage are equally unworthy of protection. Thus, Boone argues that the trial court was correct in applying *Moskovitz* to the claims file documents in this case.

Vanliner, on the other hand, asks us to affirm the court of appeals' decision, which held that *Moskovitz* was not applicable in the present action. The court of appeals found the distinguishing factor between this case and *Moskovitz* to be the status of the underlying claim. Specifically, the court of appeals noted that in the case at bar the underlying claim (underinsured motorist damages) is still pending, whereas in *Moskovitz* the underlying claim (medical malpractice) had already been decided.

We find that the court of appeals, in this regard, misread our decision. Our ruling in *Moskovitz* did not turn on the status of the underlying claim, but rather upon our recognition that certain attorney-client communications and work-product materials were undeserving of protection, *i.e.*, materials "showing the lack of a good faith effort to settle." *Moskovitz* at 661, 635 N.E.2d at 349. Moreover, this "distinction" could easily be eliminated by staying the bad faith claim until the underlying claim has been determined.

Vanliner argues that *Moskovitz* must be viewed in light of our subsequent holding in *State v. McDermott* (1995), 72 Ohio St.3d 570, 651 N.E.2d 985, so that even if our ruling in *Moskovitz* is applicable to attorney-client communications in the present case, *McDermott* requires that they be protected. We disagree.

In *McDermott*, we held that R.C. 2317.02(A) provides the exclusive means by which privileged attorney-client communications can be waived by the client. *Id.* at syllabus. The flaw in Vanliner's argument is that *McDermott* addresses client *waiver* of the privilege, whereas *Moskovitz* sets forth an *exception* to the privilege and is therefore unaffected by our holding in *McDermott*.

Vanliner further contends that if insureds alleging bad faith are able to access certain attorney-client communications within the claims file, then insurers will be discouraged from seeking legal advice as to whether a certain claim is covered under a policy of insurance. This argument is not well taken because it assumes that insurers will violate their duty to conduct a thorough investigation by failing, when necessary, to seek legal counsel regarding whether an insured's claim is covered under the policy of insurance, in order to avoid the insured later having access to such communications, through discovery.

Vanliner further argues that the release of the documents at issue in this case will undermine its ability to defend on the underlying underinsured motorist claim that remains pending. We find this argument unpersuasive. If this were a legitimate concern, we believe that Vanliner would have moved the trial court to stay the bad faith claim, severing it from the underlying underinsured motorist claim. Our review of the record in this case reveals that Vanliner took no such action.

Like the trial court, we find that the rationale behind our holding in *Moskovitz* is applicable to actions alleging bad faith denial of coverage. That is, claims file materials that show an insurer's lack of good faith in denying coverage are unworthy of protection. It appears, however, that in determining which documents were protected in this case, the trial court applied the specific holding in *Moskovitz*, i.e., only those documents containing attorney-client communications and work product that go directly to the theory of defense of the underlying claim are protected. We find this holding inapplicable in the present case because, while the lack of a good faith effort to settle involves conduct that may continue throughout the entire claims process, a lack of good faith in determining coverage involves conduct that occurs when assessment of coverage is being considered. Therefore, the only attorney-client and work-product documents that would contain information related to the bad faith claim, and, thus, be unworthy of protection, would have been created prior to the denial of coverage.

For the foregoing reasons, we hold that in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file materials

containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage. At that stage of the claims handling, the claims file materials will not contain work product, *i.e.*, things prepared in anticipation of litigation, because at that point it has not yet been determined whether coverage exists. Of course, if the trial court finds that the release of this information will inhibit the insurer's ability to defend on the underlying claim, it may issue a stay of the bad faith claim and related production of discovery pending the outcome of the underlying claim.

We now turn to the specific documents at issue herein. Out of the 1,741 documents contained in the claims file, the issue before us concerns only twenty-nine documents, namely documents numbered 581, 582, 597, 598, 600, 601, 676, 677, 885, 886, 887, 888, 889, 890, 892, 896, 899, 900, 902, 903, 904, 905, 906, 907, 1106, 1107, 1151, 1152, and 1153. Although the trial court ordered Vanliner to produce over fifteen hundred claims file documents, Vanliner's appeal sought to protect only thirty of these documents and was successful as to twenty-nine.

The court of appeals found, and we agree, that the trial court's ruling was inconsistent with respect to eight claims file documents. Specifically, the trial court ordered Vanliner to produce documents numbered 597, 598, 600, and 601 *without* Vanliner's requested redactions but ordered Vanliner to produce documents numbered 858, 859, 861, and 862 *with* the requested redactions. This was inconsistent because the information ordered to be redacted from documents numbered 858, 859, 861, and 862 was identical to the information requested to be redacted from 597, 598, 600, and 601.

We do not agree, however, with the court of appeals' approach to resolving this inconsistency. The court found that "[d]ocuments 597, 598, 600 and 601 are simply duplicates of documents 858, 859, 861 and 862" and held that "[s]ince these documents are duplicates, the trial court erred in not ordering similar redactions of 597, 598, 600 and 601." [7] From this statement it would appear that the content of these documents was not independently evaluated and that it was assumed that because the trial court ordered the information to be redacted in some documents its mistake was in not ordering the same information redacted in others. We find this analysis flawed because it does not consider the possibility that the trial court's mistake was actually in permitting the redaction of the information.

Upon review of these documents in light of our foregoing holding, we find that two of them, namely, documents numbered 600 and 601, should be released *without* redactions to Boone. These documents were created prior to the denial

---

7. The court of appeals' statement that "[d]ocuments 597, 598, 600 and 601 are simply duplicates of documents 858, 859, 861 and 862" is not correct. While the information contained in the portions Vanliner requested to be redacted is the same in document number 597 as in 862, 598 as in 861, 600 as in 859, and 601 as in 858, the documents themselves are not duplicates of each other.

of coverage and the information that Vanliner requested be redacted in these two documents, some of which reflects attorney-client communication, relates to the issue of insurance coverage. Therefore, documents numbered 600 and 601 should be produced without redactions (which makes the redactions ordered in documents numbered 858 and 859 moot).

Documents numbered 597 and 598 contain the name of an attorney with the language "We can explore with atty Maddox" and "Check with atty Maddox." These documents were communications, it would appear, between two of Vanliner's claims employees. Vanliner's attorney was, apparently, not involved in these communications on the issue in question. Therefore, we find that documents numbered 597 and 598 do not contain attorney-client communications. Consequently, the information contained in these documents is not protected by the attorney-client privilege and should be disclosed without redactions (which makes the redactions ordered in documents numbered 861 and 862 moot).

As to the remaining documents at issue in this appeal, those documents contain attorney-client communications and/or work product that were created after coverage was denied. They are, therefore, protected from discovery.

Accordingly, for the foregoing reasons, we affirm in part and reverse in part the judgment of the court of appeals, and remand this cause.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

---

COOK, J., dissenting. The majority today adopts a wholesale exception to the attorney-client privilege in actions alleging bad-faith denial of insurance coverage. The majority concludes that "claims file materials that show an insurer's lack of good faith in denying coverage are unworthy of protection." Because the majority's broad holding diminishes the attorney-client privilege without a reasoned basis for doing so, I dissent.

The majority cites no authority for the proposition that attorney-client communications leading to a denial of insurance coverage are not protected from disclosure in a subsequent action alleging bad faith. Instead, the majority relies on *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, which allowed discovery of otherwise privileged materials in an R.C. 1343.03(C) proceeding seeking prejudgment interest. The *Moskovitz* court supported its

decision by declaring documents showing lack of good-faith effort to settle "wholly unworthy" of any privilege. *Id.* at 661, 635 N.E.2d at 349.

The majority extends the *Moskovitz* rationale to this case, deciding that claims file materials showing an insurer's lack of good faith in denying coverage are similarly unworthy of protection by the attorney-client privilege. But the "unworthy of protection" rationale espoused by the majority was unsupported in *Moskovitz* and is unsupported now.

The attorney-client privilege "is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States* (1998), 524 U.S. 399, 403, 118 S.Ct. 2081, 2084, 141 L.Ed.2d 379, 384, quoting *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591; see, also, *In re Klemann* (1936), 132 Ohio St. 187, 190–191, 7 O.O. 273, 275, 5 N.E.2d 492, 493–494. Although the privilege may suppress relevant evidence, its existence is justified by the perceived long-term social benefits of open communication between lawyer and client. See 1 Rice, Attorney–Client Privilege in the United States (2 Ed.1999) 18, Section 2:3. The law will not allow the privilege, however, when the attorney-client relationship is abused. *Id.* at 22–24, Section 8:2; see, also, *Clark v. United States* (1933), 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993, 1000. Accordingly, there is a well-established "crime-fraud exception," which denies the protection of the privilege when the client communicates with an attorney for the purpose of committing or continuing a crime or fraud. *State ex rel. Nix v. Cleveland* (1998), 83 Ohio St.3d 379, 383, 700 N.E.2d 12, 16. Communications in furtherance of a crime or fraud do not further the goals of the attorney-client privilege and are therefore undeserving of protection. See *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983* (C.A.2, 1984), 731 F.2d 1032, 1038.

With its "unworthy of protection" rationale, the majority effectively equates an insurer's communications with its attorney prior to a denial of coverage, in any case alleging bad faith, with communications in furtherance of a civil fraud. But bad faith by an insurer is conceptually different from fraud. Bad-faith denial of insurance coverage means merely that the insurer lacked a "reasonable justification" for denying a claim. *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph one of the syllabus. In contrast, an actionable claim of fraud requires proof of a false statement made with intent to mislead. See *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus. Proof of an insurer's bad faith in denying coverage does not require proof of any false or misleading statements; an insurer could, for example, act in bad faith by denying coverage without explanation. *Freedom Trust v. Chubb Group of Ins. Cos.* (C.D.Cal.1999), 38

F.Supp.2d 1170, 1173.  Because bad faith is not inherently similar to fraud, there is no reason why an allegation of bad faith should result in an exception to the attorney-client privilege akin to the crime-fraud exception.  *Id.*

The majority's holding is also startling for its practical effect.  After today's decision, an insured need only *allege* the insurer's bad faith in the complaint in order to discover communications between the insurer and the insurer's attorney.  Not even an allegation of the crime-fraud exception's applicability carries such an absolute entitlement to discovery of attorney-client communications.  In order to overcome the attorney-client privilege based on the crime-fraud exception, a party must demonstrate "a factual basis for a showing of probable cause to believe that a crime or fraud has been committed and that the communications were in furtherance of the crime or fraud."  *Nix*, 83 Ohio St.3d at 384, 700 N.E.2d at 16.  The rule created today requires no similar prima facie showing of bad faith before an insured is entitled to discover attorney-client communications of the insurer.  The result of the majority's decision is a categorical exception to the attorney-client privilege applicable in *any* case alleging a bad-faith denial of insurance coverage.  This is a sweeping exception that a number of courts have refused to adopt.[8]  The majority has simply decided that insurance-bad-faith cases should be treated differently as far as the attorney-client privilege is concerned, ignoring that "[t]he nature of the relationship, not the nature of the cause of action, controls whether communications between attorney and client can be discovered."  *Palmer v. Farmers Ins. Exch.* (1993), 261 Mont. 91, 108, 861 P.2d 895, 906.

Deeming the insurer's communications unworthy of the attorney-client privilege is also inconsistent with the very purpose of the privilege.  As noted previously, the privilege is designed to encourage open discussion between attorney and client, so as to promote the observance of the law and allow an attorney to adequately advise the client.  With today's decision, the majority declares that an insurer's consultation with an attorney prior to a denial of coverage does not fall within this purpose.  The rule laid down today assumes

---

8.   See, *e.g., Dion v. Nationwide Mut. Ins. Co.* (D.Mont.1998), 185 F.R.D. 288, 294 (applying Montana law);  *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.* (D.Mass.1997), 173 F.R.D. 7, 11 (applying Massachusetts law);  *Dixie Mill Supply Co., Inc. v. Continental Cas. Co.* (E.D.La.1996), 168 F.R.D. 554, 558 (applying Louisiana law);  *Tackett v. State Farm Fire & Cas. Ins. Co.* (Del.1995), 653 A.2d 254, 259–260 (declining to create a "per se waiver" of privilege in bad-faith cases);  *Aetna Cas. & Sur. Co. v. San Francisco Superior Court* (1984), 153 Cal.App.3d 467, 476–477, 200 Cal.Rptr. 471, 477 (that insurer's "state of mind" is at issue in bad-faith action does not justify an exception to privilege);  *Hartford Fin. Serv. Group, infra,* 717 N.E.2d at 1235–1236 (relying on *Aetna* to reject exception to privilege in bad-faith cases).  See, also, *Maryland Am. Gen. Ins. Co. v. Blackmon* (Tex.1982), 639 S.W.2d 455, 458 ("if a plaintiff attempting to prove the validity of a claim against an insurer could obtain the insurer's investigative files merely by alleging the insurer acted in bad faith, all insurance claims would contain such allegations").

that an insurer will always have some sinister intent to act in bad faith when it discusses a coverage decision with its attorney. But the majority overlooks the fact that an insurance company may consult with legal counsel to obtain legal advice about a coverage decision. "[A]n insurance company's retention of legal counsel to interpret the policy, investigate the details surrounding the damage, and to determine whether the insurance company is bound for all or some of the damage, is a 'classic example of a client seeking legal advice from an attorney.'" *Hartford Fin. Serv. Group, Inc. v. Lake Cty. Park & Recreation Bd.* (Ind.App. 1999), 717 N.E.2d 1232, 1236, quoting *Aetna Cas. & Sur. Co. v. San Francisco Superior Court* (1984), 153 Cal.App.3d 467, 476, 200 Cal.Rptr. 471, 476. These types of communications further the purpose of the attorney-client privilege and should be protected in the same manner as a communication by any other client seeking legal advice from an attorney.

An insurance company that seeks legal advice from an attorney about a coverage issue will now have to consider the possibility that those communications will be subject to future disclosure in the event that coverage is denied and the insured commences a bad-faith lawsuit. As one appellate court has observed, a rule such as the one announced today threatens the open and honest discourse between attorney and client that the privilege is supposed to protect:

"[A]n insurance company should be free to seek legal advice in cases where coverage is unclear without fearing that the communications necessary to obtain that advice will later become available to an insured who is dissatisfied with a decision to deny coverage. A contrary rule would have a chilling effect on an insurance company's decision to seek legal advice regarding close coverage questions, and would disserve the primary purpose of the attorney-client privilege—to facilitate the uninhibited flow of information between lawyer and client so as to lead to an accurate ascertainment and enforcement of rights." *Aetna*, 153 Cal.App.3d at 474, 200 Cal.Rptr. at 475; see, also, *State ex rel. United States Fid. & Guar. Co. v. Montana Second Judicial Dist. Court* (1989), 240 Mont. 5, 13, 783 P.2d 911, 916. The majority's decision here discounts these concerns based on its unsupported "unworthy of protection" rationale.

For these reasons, I cannot join the majority's unsound decision to declare a whole species of communications undeserving of protection by the attorney-client privilege. I would treat bad-faith cases no differently from any other case and regard attorney-client communications as privileged when those communications satisfy all elements of the privilege. This would not mean, of course, that an insurer would *never* have to disclose the substance of attorney-client communications in bad-faith cases. An exception to the attorney-client privilege already exists, for example, when an attorney jointly represents both the insured and the insurer. When an attorney has represented the common interests of insurer and

insured, one joint client (the insurer) cannot assert the privilege in litigation against another joint client (the insured). *Netzley v. Nationwide Mut. Ins. Co.* (1971), 34 Ohio App.2d 65, 77–78, 63 O.O.2d 127, 134–135, 296 N.E.2d 550, 561–562; *Palmer,* 261 Mont. at 108, 861 P.2d at 905.[9] Moreover, if an insured asserting a bad-faith claim makes a prima facie showing of *fraudulent* conduct, the crime-fraud exception may allow piercing the attorney-client privilege as to certain claims file materials. See *Barry v. USAA* (1999), 98 Wash.App. 199, 205, 989 P.2d 1172, 1176. Courts have also recognized that an insurer in a bad-faith case may impliedly waive the privilege altogether by raising an advice-of-counsel defense, thereby placing its attorney-client communications directly at issue. *Palmer,* 261 Mont. at 110, 861 P.2d at 907; *Transamerica Title Ins. Co. v. Santa Clara Cty. Superior Court* (1987), 188 Cal.App.3d 1047, 1053, 233 Cal.Rptr. 825, 829. Unlike the majority's rationale, these limitations on the attorney-client privilege are well supported and consistent with the policy behind the privilege.

---

*Blue, Wilson & Blue* and *Richard H.H. Troxell,* for appellant.

*Frost & Maddox Co., L.P.A.,* and *Mark S. Maddox,* for appellee.

*Robert P. Rutter,* urging reversal for *amicus curiae,* the Ohio Academy of Trial Lawyers.